ABNER G. BAKER, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. A State witness was asked on his cross–examination wh) aided him in making the internal examination of the deceased, and replied that Dr. Wall did so; and was then asked: "Who requested you and Dr. Wall to do so?" and replied, " I think it was yourself." Counsel for the State thereupon objected, and inquired what was the object of this; wh reupon the defendant's counsel objected, and the court sustaining the objection, he excepted to the ruling : . *Held*, in the absence of any showing to the trial judge of the "object" not error.

2. A question was objected to and the objection sustained, but subsequently the question was answered, in effect, by the same witnes: *Held*, That any error in the ruling was cured.

3. Whereas an expert may not be interrogated upon an hypothesis having no foundation in the evidence, it is yet not necessary that the hypothetical case put to him should be an exact reproduction of the evidence, or an accurate presentation of what has been proved. Counsel may present a hypothetical case in accordance with any reasonable theory of the effect

of the evidence : and if the jury find that the facts on which
his hypothesis or theory of the effect of the evidence is based
are not proved, the answer of the expert necessarily falls with
the hypothesis.

4. Where a statement made by counsel in argument is objected to
by opposing counsel, who asks permission to be heard, and the
trial court refuses to hear the objection, and directs the op-
posing counsel to take his seat, the appellate court will not
review the action of the trial court in the absence of any
showing of what the statement objected to was, but will pre-
sume that there was nothing objectionable in the statement
and that the trial court acted rightly.

5. The fact that it could not reasonably have occurred to the de-
fendant, or did not occur to him, that the death of the de-
ceased was a reasonable or probable result of the former's as-
sault, does not prevent a conviction of manslaughter in the
fourth degree.

6. Deceased was lying upon a bed in his room after dinner when
defendant entering asked him if he owed him anything, and
deceased replied that he did. Thereupon defendant cursed
him and struck him, while he was lying on his bed on his side
with his head raised about four inches above the pillow, two
blows in the face, which blows knocked a piece of skin off the
cheek and caused one of his lips to be cut on the inner side for
an inch or three quarters, but not extending through it. De-
fendant then left the room, and deceased was found to be in
a dying condition and died without rallying. A *post mortem*
examination discovered a rupture of blood vessels and large
quantity of blood at the base of the brain ; and also slight evi-
dence of disease in the valves of the heart but not sufficient to
cause death. The deceased had been on a spree the night be-
fore, and had also taken several glasses of beer on the morn-
ing of the fatal day, and had then complained of pain at the
base of his brain, and had water poured on it. The physi-
cians who made the *post mortem* examination, they alone be-
ing examined as experts, were of the opinion that the stated

effusion of blood was the cause of death, but neither stated what produced the rupture. One of them thought it very improbable that the blows had anything to do with it, but would not say positively that they had nothing to do with it, and the other, while he thought it very improbably that the blows, of themselves, produced it, yet expressed views which support the theory that they may indirectly or through excitement causing accelerated heart action have produced it, The verdict was guilty of manslaughter in the fourth degree. *Held*, that the testimony sustained, beyond a reasonable doubt, the conclusion that death was produced or hastened by the assault.

7. Where a judge charges the jury that the State must prove that the defendant assaulted the deceased and that the latter's death was caused or hastened by the assault alleged to have been committed upon him by the defendant, the jury must be given the credit of understanding that the judge was speaking of the assault testified to by the witnesses and of so applying the charge ; and we can not impute to them a disregard of the actual case before them and action upon an extreme suppositious case put by counsel, and conclude therefrom that they misunderstood the charge or were misled.

Writ of Error to the Circuit Court for Hillsborough county.

### STATEMENT.

The testimony in this case, which was tried in the Circuit Court in December, 1891, is as follows :

E. J. Bowen, a witness for the State, testified that he saw deceased, Jonathan A. Brown, on the morning of June 15th, 1890, when he got up ; saw nothing remarkable about his health, it was good; he and Brown had been working together for about two weeks, and

were rooming together at the house of Mrs. Hale, in Ybor City; Brown was a very hard working man, and about sixty years old. After breakfast Brown went to Ybor City, returning near dinner time; he and witness ate dinner together; witness could see nothing remarkable about Brown; he ate dinner all right, as far as witness could see. After dinner they walked out of the dining room, and entered their room, and witness commenced writing, and Brown lay down on a small bed, the head of which was towards the north, to have a nap, the door of the room being open. Just as Brown had lain down, and witness had commenced to write, witness heard some one on the "stoop-way," but paid no attention to it until the question: Where is Brown? was asked, when witness turned and saw defendant at the threshold of the door, and replied: "Lying on the bed." "All he had to do," says the witness, "was to turn round, and saw Brown." He said: "Do I owe you anything Mr. Brown?" Brown said: "You do." Then defendant said: "You God damed son of a bitch," and struck him. Witness jumped from the table, but before he could get to the defendant he struck Brown the second blow. Brown was lying on his bed on his side, so that it would fetch the left side up so that the left cheek received the blow. Then witness put his hand on defendant's shoulder and said: "Mr. Baker, this wont do." Baker then turned and said: "You damned son of a bitch, if you want any more come out here and I will

give it to you." Witness then turned around to see Brown, and "found him in a dying condition, his under jaw fallen down. I saw he was mortally wounded, at least that was my judgment. I put my hand under his jaw and raised him up so as he could get his breath, if he had any to get, and I raised him up. And as I raised him, I saw that death had set in." Witness then went to the door and hallooed for those around to come and assist, called for McDonald, Barksdale and Jones, who were in speaking distance. Witness remained with Brown for some time. He did not rally, but died. This was on Sunday, June 15th, 1890, in Ybor, Hillsborough county, Florida.

On cross-examination the witness said: "Brown was in good health all the time he knew him; could not say what his condition was that Sunday morning when he returned from Ybor City, except that he appeared in good health; couldn't say that he was intoxicated; did not know that his health was injured by habits of intoxication; had known him about a year. Brown had worked for witness in Titusville; witness did not know his habits. The room was about 12 wide by 14 feet long. The door faced north, and there was just room between the partition of the house and the door to admit a single bed. When the door opened, it opened right back against the bed. The writing table was in the further end of the room, which would bring his back to the door as it opened. Witness could not see that Baker had anything in his

hand; he hit Brown with his fist. Witness did not resume writing between Baker's inquiry and his striking. Witness does not think his back was to Baker and Brown at any time while they were speaking, but thinks his whole undivided attention was on them. Brown was in a lying condition when Baker struck the second time lying down. Witness says he testified at the preliminary examination that Brown *might have been* getting up when Baker struck him. Witness should judge Brown's head was four inches above the pillow, but would not say for certain; would not say it under oath, but such was his opinion. Brown had been lying down probably about a half hour before Baker inquired for him. Witness couldn't say whether or not Brown was intoxicated on Sunday. In reply to the question, if he had not on the preliminary examination stated that Baker, after getting outside, had said : "My name is Baker, from South Carolina, and if you want any more of me come outside," witness said: It is impossible for any human being to recollect every word and everything done so long ago, and one word might have been changed, and not materially changed; possibly I might have said so; I won't say I said so. It is so long ago my memory isn't certain. He said: "If you want any more come out and I will give it to you."

On the re-direct, the witness was asked if he was positive the defendant used the vile epithet mentioned

in the direct examination, he replied: "Yes, sir, he used it."

Question.   You state it on your oath?

Answer.   "Yes, sir, as near as I can recollect.   It is impossible to tell exactly.   I defy any man to do it."   Being asked, on re-cross, if he had testified on the preliminary examination that it was used, replied: "I did, if my memory serves me right."

J. D. McDonald, a witness for the State, testified that he knew defendant and knew Brown.   Brown died between 2 and 3 o'clock, June 15th, 1890, in Ybor City; did not see him die.   Did not see Baker that day; heard Baker's voice after the occurrence.   "I heard Baker say, with an oath : ' My name is Baker, from South Carolina ; if you want any more come out and I will give it to you.' "   Thinks the oath was, " God damn your soul;" didn't pay much attention to it, but there was an oath ; it might have been, " You damn son of a bitch."   Witness presumes Baker was on the piazza or just off of it.   It was Baker's voice.   Witness was lying down and lived in a house about twenty feet from that which Brown lived in.

John A. Jackson, a witness for the State, testified that he was a physician and surgeon, and had been one between five and six years, and was a graduate from the College of Physicians and Surgeons, in New York City.   Was called upon to make a *post mortem* examination of the body of the deceased, and examined the

whole body thoroughly externally, then opened the chest and examined the heart, and then opened the skull and examined the brain. There were two slight bruises on his person ; the skin was knocked off on the cheek, very superficial, about the size of a dime, and the upper lip was cut on the underside about three-. quarters of an inch, or an inch, not extending through the lip. Found some little irregularity about the valves of the heart, some chalky deposits.

Question. Anything necessarily fatal about the heart ?

Answer. There were signs of heart disease. I saw nothing about them to cause his death. Found large quantities of blood at the base of the brain, loose, extending down the lower part of the neck. Did not examine the arteries or veins, as everything was so discolored. There were signs of a blood vessel being ruptured. These blood vessels rupture from disease or accelerated heart action, as a rule, both go together ; or it might be brought about from the force of a blow. Whether it would be the force of a blow, or the concussion from a blow, that would be more apt to cause rupture, would depend upon the point of the injury. It is possible for these vessels to be ruptured without breaking a bone. Brown seemed to be hardly past middle life, should say at least fifty. Naturally the veins or arteries of a man of that age would probably be a little more brittle than in a younger man, though you might examine a man at that age and find

them perfectly natural. The chances are about even at that age. From his examination of the person of Brown, witness would say that hemorrhage at the base of the brain brought about his death.

Question. Can you state what would produce that hemorrhage ?

Answer. As I told you before, it might be caused by a severe blow, or some excitement causing —————— action of the heart.

Cross - examination : The first examination was simply external. Dr. J. P. Wall aided in opening the chest and skull, the internal examination. The first examination was the day of the death, and the second, or internal, was the next day. Found the valves of the heart diseased to some extent. Can't tell what particular valve now, it is so long ago. Remember distinctly finding chalky deposits. They were small white deposits, probably two or three at most, not larger than the size of a half of a pea, and besides there was some roughness of the valves, which would naturally be smooth, showing some impairment of these valves. Did not discover what veins or arteries were ruptured which caused the effusion of blood at the base of the brain. On account of the discoloration could not tell whether these veins or arteries were diseased. In witness' opinion, it would be very improbable that two blows upon the face and the parts of the

face, as testrfied to by him, and leaving the marks seen there, should produce death. The cut on the lip was on the inside of the upper lip; it was caused by the man's teeth; he had sharp teeth; witness examined them; they were plain, ordinary teeth, perfectly firm and well worn, giving a smooth horizontal surface, making them pretty sharp, worn smooth and flat on the edge either from age or the use of a pipe.

Re-direct examination: Question. I believe you stated in the direct examination that the bursting of those blood vessels in the brain might be occasioned by excitement of the heart, or some sudden blow.

Question. In case of a blow, would the arteries or blood vessels be broken on the side next the blow, or on the opposite side?

Answer. I think it would not make any difference at all. I don't really think—it is very improbable that a blow on the face would rupture a blood vessel in the brain. The face has more or less springs in it.

Question. Will you state it as your medical opinion that those blood vessels were either broken from sudden excitement of the heart, or some blow?

Answer. I gave those as the two most probable causes. As to what was the real cause I can not tell.

### TESTIMONY FOR DEFENDANT.

L. W. Lawson testified he had known Brown about two months before his death, and saw him about eight or nine o'clock of the morning of the day he died.

Witness was a bar tender at Sendoya's, and Brown was in there that morning, and Brown asked witness if the latter had any ice water, and witness replied that the ice had melted out of it. Brown replied that he guessed it would do, and said: "Pour it on my head; it feels as if it would burst." He also said he had been on a "kind of a turn around;" on a drunk last night, and was top heavy. He also wanted another drink to straighten him up, and witness gave him a glass of beer; he had several glasses; he told witness to pour the water on the lower part of the back of his head. Brown remained in the saloon three quarters of an hour, and took five or six drinks of beer while there.

Salam Austin, who had known Brown a month or two before his death, saw him at the same time in Sendoya's bar room, and heard him complain of having a heaviness in his head, and ask the bar tender to pour the ice water on his head, and say that he had been on a right smart of a time, and that he was feeling bad. Brown held his head down and the bar tender poured the water, and asked him if it did any good, and Brown replied : "I don't know; I feel very bad still; give me another glass of beer."

George P. Barksdale testified that he saw Brown on the day of his death, in Ybor City, between 11 and 12 o'clock, in the yard where he, Brown, was boarding, and thought he was drunk; Brown was coming around the house, and walked like he had been drinking—like a drunken man would. Witness did

not know that he could describe how Brown walked, as witness had never got drunk. Brown staggered some; had known him about a year, and was with him about six months at one time.

John P. Wall testified that he was a physician and surgeon, and had practiced thirty-three years in Florida and Virginia; he assisted Dr. Jackson in the examination of the body of Brown; that the heart showed signs of chalky deposits in the valves, at the tips of the valves; particularly of the aorta, the main blood vessel going to the heart; this valve is semi-lunar, and right in the center was a chalky deposit. In the aorta was a patch of——disease, as we term it, so of course it was my inference that that disease extended into the arteries of the skull, particularly about the base of the brain. There was an effusion of blood at the base of the brain, between the brain and the line of the skull. The pain in the back of the head complained of by Brown, as testified to by Austin and Lawton, would be a symptom of congestion about the base of the brain, possibly amounting to a slight effusion.

Question. Would that congestion be increased or diminished by the use of liquor, such as beer?

Answer. "It would cause the heart to throw the blood with more force." Witness states he examined the wounds on the face of Brown, and that in his opinion, as a medical expert, two ordinary blows that would cause these wounds did not result in the death of Brown.

Cross-examination. Being asked if the excitement caused by a fight and a man striking a blow would not necessarily increase the congestion, of which the complaints made by Brown was a symptom, he replied: "It might, though not always, because you know when some men get mad they turn pale, and some get kind of red." Asked if the reception by the deceased, supposing him to be suffering from congestion of the brain, of two blows on the face or head, accompanied by the excitement of a fight, would not necessarily increase the congestion, he answered: "It might tend to that. I will try to explain: There are two forms of congestion, one called active, caused by increased action of the heart, and another passive. As a rule the action of the heart is weakened in the passive, particularly if there is any fright connected with it; people sometimes faint from fright. The circulation of the blood is more sluggish in the diseased part, or the part previously congested. The passive character is not from lack of blood, but more blood is drawn into the head." In reply to the question, if it would necessarily follow from the fact that Brown was suffering from headache, such as described, that he was suffering from congestion of the brain; or if it might not follow from the effects of drinking, he said: "If the autopsy showed an effusion of blood, I should say he was suffering from congestion, as it did in this case. When I use the term congestion of the brain, I mean the membrane about the brain, not so much the brain itself; the membrane between the brain and the skull."

Question. Supposing the congestion was of the brain itself, how long would a person live?

Answer. Congestion of the brain is not of very frequent occurrence.

Question. When it does occur, is it considered by the medical fraternity as fatal, or not immediately fatal?

Answer. The whole brain being congested?

Question. Yes.

Answer. It does not occur.

Question. With the membrane of the brain congested, as you say you judge this man's to be, would that be of itself fatal necessarily?

Answer. No; not unless followed by rupture or inflammation. Congestion is the first stage of the inflammatory process.

Re-direct examination. Question. After making an examination of this man's body, in your opinion, did those two blows upon the face cause that man's death?

Answer. The blow upon the face, of itself, would hardly have produced this. If there was a blow upon the face when a man fell and struck something hard, we might have this condition, or if his head was resting on a hard substance when he received the blow, we might have this condition. I would not say positively that the blow had nothing to do with the rupture, though I think it very improbable.

The defendant then· made a statement as follows: "This man Brown had been in my employ, for which I had paid him, and we came to a settlement, I think it was the 8th day of May; there were thirty-one cents due him. He said; 'Mr. Baker, I've been looking over the labor, and I think you ought to pay me something extra.' I handed him a five dollar bill and said: 'Are you satisfied?' he said. 'I am,' and that was the last business transaction, or transaction of any kind, we ever had. We never had fallen out, to my knowl-·edge. I was uniformly kind to him from the time he came to work for me in March. I had even paid a fine for him when he was prosecuted. But this Sunday morning I was lying at home asleep on the sofa, when a boy brought a letter that Brown had written to a lady, charging me with embezzlement, which was very insulting. I went there and asked if Brown was in; Brown answered: 'Yes, I'm in.' Bowen was sitting just opposite, with his back to me, writing. I didn't see Brown. I said: 'Where is Brown?' He answered, 'Here I am.' I walked around. All my purpose was to have an understanding. I said: 'Did you say I owed you money and wouldn't pay it?' He said: 'I did.' By this time Brown was nearly in a sitting position, and when he answered me 'I did,' I struck him twice; not heavy blows, because he was too near me. Bowen spoke—he didn't put his hand on me—and said: 'Baker, this will never do.' His voice brought me to myself. I went out, not thinking Brown

was hurt. When I got out I said : "If you want any satisfaction you can come outside ; my name is Baker, from South Carolina.' I walked off and did not see him any more. Subsequently I heard Brown had died. I came to town to see my lawyer; gave myself up, and authorized my lawyer to get a physician to hold an autopsy. I had no enmity against him, and can say that if that man had come to me, instead of sending a boy, and asked for a couple of dollars, he would have got it, as he had done before. I had been a friend to him continually."

The judge charged the jury, to which charge there was no exception, and the jury returned a verdict of guilty of manslaughter in the fourth degree, and a motion for a new trial having been made and overruled, the court sentenced the accused to imprisonment in the county jail for the term of six months, and to the payment of a fine of five hundred dollars ; and, in the event the fine should not be paid at the expiration of the six months, to six months' longer imprisonment in lieu of said fine.

The other facts in the case are stated in the opinion of the court.

*MacFarlane & Pettingill & MacFarlane* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

RANEY, C. J.:

I. Upon the trial of this cause in the Circuit Court,

Dr. Jackson, a witness for the State, was asked on his cross-examination who aided him in making the internal examination of the body of the deceased, and he replied that it was Dr. J. P. Wall; and he was then asked: "Who requested you and Dr. Wall to do that?" and replied: "I think it was yourself." The entry in the bill of exceptions at this point is as follows: "Counsel for the State objects, and asks what is the object of this. Court sustains the objection, and counsel for the defense save an exception to the ruling of the court." It is urged before us that the impression made upon the jury by what is shown by this entry was the same as though the answer had been stricken out as immaterial; that the enquiry was material and proper; that the defendant had the right to bring to the knowledge of the jury, whether the autopsy was made at the instance of the State or of the accused; that whereas, in the absence of any showing to the contrary, it is a natural inference that a proved autopsy was procured by the State, yet in case of the State's failure or disinclination to have one made, the defendant's willingness and promptness in causing one to be had, are legitimate facts for the consideration of the jury. All that is necessary to be said in disposing of the point is, that counsel for the prisoner, when asked what his object was, does not appear to have made it known to the court. If his object was as indicated here, that court was not informed of it. Having got before the jury the fact that he had requested the doctors to make the internal examination, counsel fails to disclose his object when

called upon by the State for it. Without intimating
any opinion as to whether it would be proper under
any circumstances to permit the defendant to show to
the jury that an autopsy had been made at his in-
stance, it is sufficient to say that it does not appear
that any application to do so was made to the trial
court in this case, and that the judge did not err, even
if his action can be held tantamount to striking out
the reply of the witness to the last question. When
the question shall have been presented to a trial court
and ruled upon, it will be time enough for us to con-
sider it. The fact stated by the answer was, as it ap-
pears in this record, entirely immaterial to the defen-
dant's case. McLean vs. Spratt, 20 Fla., 515 ; Green-
leaf's Ev., sec. 51 a ; Van Buren vs. Wells, 19 Wen-
dell, 203 ; Crenshaw vs. Davenport, 6 Ala., 390 ; Tug-
gle vs. Barclay, Id., 407 ; Abney vs. Kingsland, 10
Ala., 355 ; Yeatman vs. Holt, 6 Humph., 375 ; State
vs. McAllister, 24 Me., 139.

II. The same witness, Dr. Jackson, having testified
on cross-examination that on account of discoloration,
he could not tell whether the veins or arteries at the
brain were diseased, was then asked : Do you think
if these veins and arteries had been healthy, that two
blows on the face of ordinary force that would have
caused the marks you saw there, would have ruptured
those blood vessels ? To this question the State ob-
jected on the ground that it was improperly put, and
was immaterial, and the court sustained the objection ;
and the defendant excepted. We are satisfied, on ac-
count of subsequent testimony of the same witness,

that no injury has resulted to the defendant from this action of the court, even if it was erroneous. Immediately after this ruling the witness, answering a question put by defendant's counsel, said that it would be very improbable that two blows upon the face and parts of the face, as testified to by him and leaving the marks seen there, should produce death ; and then on the re-direct examination he said it was very improbable that a blow on the face would rupture a blood vessel in the brain, the face having more or less springs in it. This testimony answers, in effect, the excluded question. Assuming that the witness meant that it was very improbable that the blows would have ruptured a diseased vein and thereby produced death, the inference is necessary that it would have been still more improbable that they would have had this effect on healthy veins.

III. It is also complained that there was error in permitting the State Attorney to ask Dr. Wall, a witness for the defense, the following question: Would not a man in the condition you have testified this man was in, supposing him to be suffering from congestion of the brain, receiving two blows on the head or face, accompanied by the excitement of a fight, necessarily increase the congestion ? The objection made to the question was, that it was based on a hypothesis not consistent with the facts testified to in the case. Whereas an expert may not be interrogated upon an hypothesis having no foundation in the evidence, it is

yet not necessary that the hypothetical case put to him should be an exact reproduction of the evidence, or an accurate presentation of what has been proved. Counsel may present a hypothetical case in accordance with any reasonable theory of the effect of the evidence. If the jury find that the facts on which his hypothesis, or theory of the effect of the evidence, is based, are not proved, the answer of the expert necessarily falls with the hypothesis. 1 Greenleaf on Evidence, 440; Wharton's Crim. Ev., sec. 418; Lovelady vs. State, 14 Texas Ct. App., 545; Augsbury vs. People, 1 N. Y. Crim. Rep., 299; Cowley vs. People, 83 N. Y., 464; Guiterman vs. Liverpool, N. Y. & P. S. Co., *Ibid*, 358; People vs. Lake, 12 N. Y., 358; Hovey vs. Chase, 52 Maine, 304; Davis vs. State, 35 Ind., 496; Greenley vs. State, 60 Ind., 141; Guetig vs. State, 66 Ind., 94; Schlencker vs. State, 9 Neb., 241. The failure of the "excitement of a fight," objected to here, does not seem to us to present any inconsistency to the evidence; and there is in the question nothing about "continued excitement." Whether there was a fight between the accused and deceased, in the sense of an altercation, which could and naturally would have caused a feeling of excitement in the deceased, was a question for the jury to pass upon finally. Of course no other "fight" than the altercation, as it is described in the testimony to have occurred, could have been understood by the jury as referred to by the

question, or have been considered by them in making up their verdict.

IV. The fourth and fifth assignments of error are submitted together as presenting but different aspects of the action of the court complained of. The bill of exceptions, after stating the conclusion of the testimony, reads as follows: "And thereupon the counsel for the State of Florida, in the course of his argument to the jury, did make a certain statement, to the making of which statement in argument, the defendant by his attorney did then and there, standing up in his place in open court, object and ask permission to be heard; but the said judge did then and there refuse to hear the said attorney for the defendant, or to permit him to state his said objection, and did ·order the said attorney for the defendant to take his seat, to which action and decision of the said judge, the said attorney did then and there object."

As stated in the counsel's brief, the error alleged in the former of these two assignments is the refusal to hear the objection which counsel then desired·to make, and that of the other one is ordering counsel to take his seat, and refusing to hear him when he stood in his place and claimed the attention of the court. It is apparent that the above extract from the bill of exceptions does not show what the statement, which it was the purpose and desire of counsel to show to object to, was; and surely an appellate court never will say that any act *in pais* of a trial court is reversible error when

it does not know what the act complained of, or which
it was sought to object to, was.   The mere fact that a
trial court has deemed a statement or argument of
counsel so palpably correct as to render any objection
unworthy of the court's countenance, is no evidence
to an appellate court that error has been committed.
In the absence of any presentation, in due form in the
bill of exceptions, of the statement or argument
which it was desired to object to, we can not say that
the court erred in requiring counsel to resume his seat,
but must presume that there was nothing said to
which an objection should have been entertained.   It
is established law, decided time again, in this court
and elsewhere, that in all such matters, the presump-
tion is that the trial court acted rightly, unless the
contrary is affirmatively shown.   In Mainard vs.
Reider, 2 Ind. App., 115, and Newton vs. State, 21
Fla., 53, 91, cited by counsel for plaintiff in error, the
objectionable remarks are set out in the bill of excep-
tions, and were held prejudicial to the parties appel-
lant.   See also Willingham vs. State, 21 Fla., 761.
To hold that error is shown by the record on this point,
would be to decide nothing less than that the Circuit
Courts have no control over the argument of causes
before them, and that any and every statement of an
attorney in submitting his client's case is the legiti-
mate subject of objection and the due occasion for in-
terruption and delay, by opposing counsel, and that
all such objections, however frivolous or frequent,
must be listened to.   Any such idea is fatal to the or-
derly, wise and proper conduct of judicial proceed-

ing and can not be tolerated. The principle, that the matter of which error is alleged must be presented to the appellate court as it occurred, is as applicable to matters of this kind as of any other nature. How can we say that a court erred in refusing to listen to an objection, unless we are informed what the matter which it was desired to object to, was; or that it was wrong in requiring counsel to resume his seat during argument of the opposing attorney, unless it is made to appear that there was something of objectionable nature to which he should have been allowed to object. The right of counsel to be heard is not under estimated by us in its importance to clients or to the bar; but an abuse of sound discretion by a court can not be assumed for the benefit of either of these classes of persons.

It may be proper to remark, if it can be inferred that the statement attributed to the State Attorney by the motion for a new trial is the one referred to by the above recital in that motion is, in view of the denial of the motion, not evidence that any such statement was made, but if it was, the affidavit of that officer, incorporated into the bill of exceptions, shows that the judge promptly sustained an objection to the only improper remark made, and that everything was done necessary to remove any improper impression which it could have made.

V. This brings us to the sixth assignment of error. The first and second grounds of the motion for a new

trial are, in effect, that the verdict was contrary to the evidence and the weight thereof; and the third ground is, that the verdict is contrary to the law; and the fifth ground is, that the jury did not give the defendant the benefit of a reasonable doubt.

Manslaughter in the fourth degree, of which the defendant was convicted, is thus defined by the criminal code of 1868, p. 352, McClellan's Digest:

Sec. 17. The involuntary killing of another by any weapon, or any means neither cruel nor unusual, in the heat of passion, in any cases other than such as are herein declared to be excusable homicide, shall be deemed manslaughter in the fourth degree.

Sec. 18. Every other killing of a human being, by the act, procurement, or culpable negligence of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder, or manslaughter of some other degree, shall be deemed manslaughter in the fourth degree.

Counsel contending, under the third ground of the stated motion, that the evidence, even if it shows some casual connection between the striking of the blows by the defendant and the death of Brown, did not warrant the verdict, argues that in order to sustain a verdict of manslaughter, the death of the person must have been not only directly or indirectly caused by the acts of the defendant, but must have been such as to be one of the reasonable or probable results of such

acts, and if it be such as could not have occurred to the defendant as a probable result, then he should not have been held liable; that to hold otherwise is subversive of the accepted doctrine of intent which is the logical foundation of the law regarding crimes which are *malum in se;* that if individuals are strictly held to a responsibility for the probable and reasonable results of their acts, society will be amply protected without the injustice and oppression likely to be caused by the more extreme view necessary to sustain this verdict, if it can be sustained by any possible view of the evidence in this case.

Of course it is not necessary to the support of a verdict of manslaughter in the fourth degree, that the death of the person killed should have been a reasonable or probable result of the defendant's acts, in the sense in which this expression is used by counsel, or, in other words, the fact that it could not reasonably have occurred to the defendant or did not occur to him that death was a probable result of the act, does not prevent a conviction of manslaughter in this degree. This being so, it is only necessary to say to the remainder of counsel's contention, that its discussion is beyond our functions, and that it can find practical consideration in the legislative department only.

It is urged under the first, second and fifth grounds of the motion, that the evidence tends far more

strongly to prove that the blows struck by the defendant had no casual connection whatever with the death of Brown, than to prove the contrary; and further, that the weight of evidence was clearly against the jury's conclusion, and did not show beyond a reasonable doubt that the death was caused or hastened by the blow in any legal or legitimate sense. In support of this position it is asserted by counsel that both Dr. Jackson and Dr. Wall testified that the death was directly the result of the effusion of blood found at the base of the brain, and that it was improbable this effusion was caused by blows struck by Baker. Dr. Jackson states, it is true, that it was very improbable that two blows upon the face or the parts of the face, as testified to by him, should produce death; and again that it was very improbable that a blow on the face would rupture a blood vessel in the brain, the face having more or less springs in it; but he had previously said that these blood vessels rupture from disease, or accelerated action of the heart, and that, as a rule, both go together; and that such ruptures might be brought about by a blow; and again, having expressed the opinion that hemorrhage at the base of the brain brought about Brown's death, he says that such hemorrhage might be caused by a severe blow or some excitement causing  *  *  action of the heart. And immediately after saying it was very improbable that a blow on the face would rupture a blood vessel, he states, as his medical opinion, that the two most

probable causes of the breaking of those blood vessels were sudden excitement of the heart, or some blow, yet he could not tell what was the real cause. Dr. Wall's statement is, that two ordinary blows that would cause the wounds found on the face of the deceased, did not result in his death. Again, asked if, in his opinion, after making an examination of the man's body, those blows on his face caused his death, he replied: "The blow upon the face, of itself, would hardly have produced this. If there was a blow upon the face when the man fell and struck something hard, we might have this condition, or if his head was resting on a hard substance when he received the blow, we might have this condition. I would not say positively that the blow had nothing to do with this rupture, though I think it very improbable." From the above summary of the evidence, as well as the general statement preceding this opinion, it will appear that counsel would be justified in saying that Dr. Jackson gave it as his opinion that the hemorrhage or effusion of blood at the base of the brain was the cause of Brown's death; and also in saying that he gave it as his opinion that it was very improbable that the blows, of themselves, produced the rupture or hemorrhage directly, but we think there is nothing in Dr. Jackson's opinion that militates against the idea that the blows may have indirectly, or through excitement causing accelerated heart action, produced the rupture and hemorrhage, but this view clearly sustains this

theory. It is true that he himself could not decide what was the real cause of the rupture, but he distinctly says that the two most probable causes of the breaking of the blood vessels were sudden excitement of the heart, or some blow. It is a patent fact that Dr. Wall did not state, nor was he asked, what in his opinion, produced the rupture, or hemorrhage, and death; still the only inference to be drawn as to his opinion of the death is that it was the result of congestion accompanied by effusion. True he says, as did Dr. Jackson, that the two blows did not produce death, but it is evident that he, like Dr. Jackson, meant by this statement that they did not do so directly, or of themselves. We must admit, however, that in his opinion it was very improbable that the blows had anything to do with the death of the deceased, though he would not take the responsibility of saying positively that they did not. He admits that the excitement caused by a fight and a man striking a blow might insrease congestion, though not always, and that the reception by the deceased of two blows on the head or face, supposing him to be suffering from congestion of the brain, might, when accompanied by the excitement of a fight, tend to increase the congestion, at least if the congestion was active, though, if we understand him, it might not if it was passive in its character or classification.

We do not agree with counsel in their view of the effect of the evidence. There is no doubt that death

followed the blows immediately.   And assuming even, as Dr. Wall says may have been the case, that there was congestion and even slight effusion at the base of the brain on the morning of the fatal day, when the deceased was seeking relief from pain by having the bar-keeper pour ice water on the annoying spot, and that the use of beer would cause the heart to throw the blood with more force, and, as we must infer, increase the congestion or effusion, there is in these facts, or either of them, nothing which militates against the theory that excitement producing accelerated action of the heart would have increased the congestion, or have started the hemorrhage or effusion originally, or have renewed that which may have been going on that morning.   There is certainly no proof that Brown was suffering pain after he returned to his boarding house, or that he was in a dying condition when the defendant entered the room; on the contrary, the jury were justified in concluding that he had so far recovered from his spree of the previous night as certainly not to be in a dying condition.   There is nothing in the testimony of Bowen that tends against or does not support this conclusion; and the deceased's answering the accused and rising in his bed to nearly a sitting posture, as stated by the accused, or to a less extent, as was the impression of Bowen, refute the idea that the juncture of his death was simply concomitant with the assault upon him, but attributable to other causes, and not produced or hastened by such

assault.   Dr. Jackson says  he saw nothing about the
signs of heart disease to cause death.    There is no tes-
timony which can be pointed to as proving or justify-
ing the inference that Brown would have died then
and there if he had not been assaulted, or that when
he went upon the bed  he was in a condition which in-
dicated that his end was at hand.    An assumption
that the deceased would have died when he did, had
no assault been made upon him, carries us into the
domain of mere speculation ; neither of the physicians
said that he would, nor is there a single item of testi-
mony upon which the finger  can be put as supporting
such a theory.    The only rational view of the case is
that Brown was in such a physical condition, or state
of health, as made the assault upon him fatal in its
consequences, and that the effect of that assault act-
ing directly or indirectly upon that condition, brought to
a close a life which but for it would have lasted longer.
There is in the  testimony nothing capable of raising a
reasonable doubt of the correctness of this conclusion ;
a mere speculation that he might have died, is not a
reasonable doubt.    Of course no one believes that this
assault would have killed a  healthy man, but  that it
was calculated to excite in the  highest degree any or-
dinary man, considering the unfair advantage at which
the deceased was taken, the character of the blows, and
the language and action of the accused, is indispu-
table.    That the attack was hostile, excited and angry,
is evident both from  Bowen's account and that of the

accused ; and the statement of McDonald also supports
this view. The blows were at least severe ; the
language of the accused exhibited very positive hos-
tility; and the degree of his excitement is well indicated
by not only his acts and language, but by his own state-
ment, that Bowen's "voice brought me to myself.'"
The testimony of the experts furnishes a reasonable
theory of the operation of the assault as the cause of
death ; their cautiousness as to saying what produced
the congestion and hemorrhage did not relieve the
jury from the duty of passing upon the question of
the prisoner's guilt, nor does it raise any reasonable
doubt of the correctness of their decision that the
assault was the cause of the death. The testimony
supports the judgment to the exclusion of any reason-
able doubt; and there is in the authorities cited by
counsel for the accused (Wharton's Criminal Law,
311 ; Robinson vs. State, 16 Texas Ct. App., 347 ;
Lucas vs. State, 19 *Ibid*, 79 ; Bush vs. Commonwealth,
78 Ky., 268) nothing that shakes this conclusion.

VI. The only remaining point is as to the charge to
the jury. In his charge the judge said, *inter alia :*
"The State must prove that the defendant assaulted
Brown within Hillsborough county, State of Florida ;
that he assaulted him, and that Brown's death was
caused or hastened by the assault alleged to have been
committed upon him by the defendant at the bar. All
these material facts are incumbent upon the State to
prove ; not for the defendant to disprove." It is urged
that this was misunderstood by the jury and misled

them, in that the terms or idea, *death hastened by the assault*, might have been misunderstood to include a collateral as well as a casual relation between the two. The argument used is : If a person could be supposed to be in such a condition through the progress of some insidious disease as that an unexpected touch should cause abnormal heart action sufficient to produce death, and another person, ignorant of this peculiar condition and with no intention of inflicting more than temporary discomfort of the body, should come up behind the first and inflict a blow however slight and with however innocent intention and the death of the diseased person should ensue, the innocent, though technically guilty movant, would be as much guilty of manslaughter as was this defendant ; that in either case the death was not the result of the blow, but the result of a pre-existing condition, and the blow only a collateral circumstance at most, assisting to aggravate the condition.

We must give the jury the credit of understanding that the court was speaking, as it was, of "the assault" testified to by the witnesses or proved by the evidence, and of so applying the remarks of the judge ; and must not impute to them a disregard of the actual case before them and action upon an extreme suppositious case like that put by counsel. There is no ground for even supposing that the jury was misled or misunderstood the charge.

The judgment is affirmed.