469 So.2d 790 (1985)
James Elmer BRATE, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 84-233.
District Court of Appeal of Florida, Second District.
March 29, 1985.
Rehearing Denied May 20, 1985.
David A. Maney and Lee S. Damsker of Maney & Damsker, Tampa, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Frank Migliore, Jr., Asst. Atty. Gen., Tampa, for appellee.
*791 BOARDMAN, EDWARD F. (Ret.), Judge.
The state charged appellant James Elmer Brate, Jr., with second degree murder of Paul Kachanovich, an individual who died of abdominal injuries shortly after being involved in an automobile collision and then being stomped in the abdomen by appellant. Following a jury trial, appellant was convicted of manslaughter; he challenges that conviction in this appeal, contending that the state's evidence was legally insufficient to establish his criminal agency as the cause of Kachanovich's death. We disagree and thus affirm.
The circumstances surrounding Kachanovich's death can best be described as bizarre. Kachanovich, posing as a hired assassin, accompanied David Benson to abduct Benson's ex-wife, Jackie, from the mobile home which she rented from appellant in Ruskin. Appellant, who was romantically involved with Jackie, learned of the abduction while it was in progress; he and his foster son, Charles Bloodgood, raced to the scene and then pursued the fleeing Benson vehicle as it sped wildly through the streets of Ruskin.
At one point in the pursuit, appellant attempted to block Benson's exit from a shopping center parking lot by positioning his pick-up truck in front of the oncoming vehicle. Benson approached the exit at a speed of approximately twenty to thirty miles per hour, swerved to avoid a head-on collision with appellant's truck, and ultimately struck the front of the truck with his vehicle's left rear door. Continuing to drive like a "mad man," Benson then bounded over a curb, drove through a drainage ditch, and finally raced back onto the highway. According to Jackie, who was a backseat passenger in the Benson vehicle, the force of the collision with appellant's truck threw her "pretty hard" to the left and was sufficient to break the back window. Jackie "thought" that Kachanovich, the right front seat passenger, was thrown against the dash during the collision, but she "wasn't sure" and conceded that she was "just speculating."[1] Photographic evidence subsequently established that the right front dashboard of the Benson vehicle had been indented and bent up slightly during the episode. The exterior of the car was only moderately damaged, however.
Benson's vehicle continued down the highway at breakneck speed, but appellant's truck was unable to keep pace with the fleeing vehicle due to body damage sustained in the collision. Benson's car later swerved off the highway at an overpass near Interstate 75 and slid down the steep embankment, coming to a "very abrupt stop" at the bottom of the embankment and ending up mired in three feet of water, with the front end of the vehicle pointing back up the embankment. The grass near the vehicle caught fire. Benson dragged Jackie from the wreckage and then secured a ride for the twosome with a passing motorist. Before Jackie left the scene, however, she observed Kachanovich sitting passively in the wrecked vehicle, making no attempt to escape the approaching grass fire. According to Jackie, he had quietly endured the entire maniacal ride, except for a brief moment after the collision when he grabbed Benson by the neck, begging him to stop the car.
Moments later, Joseph McLendon, his son, John, and his stepson, George Farmer, stopped at the embankment after noticing smoke billowing from the grass fire which surrounded the Benson vehicle. These witnesses observed Kachanovich situated approximately halfway up the embankment, kneeling down, pulling up his pants, and straightening his shirt. It appeared to Joseph McLendon that Kachanovich had removed his shoes and clothing to prevent them from getting wet when he exited the car and thus was in the process of redressing when the witnesses arrived. Kachanovich obviously appeared to be "sick, drunk or something," as evidenced by his dazed demeanor and complete disregard for the approaching grass fire, which was burning *792 only a foot or two away. Joseph McLendon shouted instructions for Kachanovich to get away from the fire, but the victim did not respond. Finally, the McLendons helped Kachanovich up the embankment and positioned him on the guardrail.
Appellant arrived at the scene in an obvious state of agitation and attempted to question Kachanovich concerning Benson and Jackie's whereabouts. When Kachanovich offered no response, appellant hit the victim twice in the face, knocking him off of the guardrail with the second punch. Kachanovich then gestured in the direction of the couple's alleged departure; appellant reinstated him to the guardrail and raced off in the direction indicated. After this encounter, Kachanovich "straightened" himself up and began putting on his shoes. The McLendons later persuaded the victim to move to the guardrail on the opposite side of the highway to escape the smoke from the fire.
Appellant returned approximately ten minutes later, visibly angry because he had been unable to locate Jackie. He questioned Kachanovich again but received no response. He then informed Kachanovich that he was from New York and that people from New York "got killed for doing things like this." After this announcement, appellant punched Kachanovich in the face a few times, again knocking him off of the guardrail. He then bent over and administered a couple of "fairly short punches" to Kachanovich's face as the victim lay on the ground. Finally, the 200-pound appellant straddled the guardrail and stomped or kicked Kachanovich once in the lower chest or upper abdomen with his cowboy boot, losing his balance in the process. Kachanovich gave no verbal or visible indication that he had suffered pain as a result of the beating and stomping, and with the exception of a recently bloodied mouth, he appeared to be no more seriously injured than he had been immediately after the embankment accident. Nonetheless, bystanders intervened and cautioned appellant not to stomp Kachanovich again for fear that he "might beat [the victim] to death or something." Kachanovich, who had made no effort to fight back or defend himself, got up unassisted and stood by the guardrail, wiping blood from his mouth with his handkerchief. After calming down, appellant ultimately went over and apologized to the victim.
Medical personnel arrived at the scene and transported Kachanovich to the hospital where he was admitted for "severe abdominal pain" and general trauma. Paul Kachanovich died approximately four hours after the accident of abdominal bleeding which emergency surgery failed to control.
At trial, Dr. Lee Robert Miller, Hillsborough County Associate Medical Examiner, a witness for the state, provided the only testimony concerning the cause of Kachanovich's death. Dr. Miller testified that the forty-nine-year-old decedent died of massive hemorrhaging in the abdominal cavity after he sustained internal injuries over a five- or six-square inch area in the upper abdomen, toward the midline of his body. The doctor believed that those injuries had been caused by a blunt trauma probably inflicted immediately above the injured area by an undetermined number of blows, estimated to be "not many" in number. A faint one-and-one-half-inch bruise appeared on the decedent's torso, where his lower left rib cage met his abdomen and was "possibly suggestive" of what had happened to him. Lack of severe, external bruising was not inconsistent with a serious abdominal injury.
Dr. Miller also testified that Kachanovich possessed a blood alcohol level of 0.15 at the time of his hospital admission, a level which made him legally intoxicated. Dr. Miller then explained that alcohol acts as an anesthetic in many persons, making them less cognizant of and responsive to pain. He could not determine, however, whether it had had such an effect on Kachanovich.
When questioned as to the cause of the blunt trauma, Dr. Miller testified that the blow would have been consistent with either a stomp with a cowboy boot or a passenger's thrusting impact with the *793 dashboard of a vehicle after it has been struck on the left rear door. The doctor further stated, however, that stomping a passenger who had sustained an abdominal injury in a broadside collision "probably would materially contribute to the cause of death." (Emphasis added.)
On cross-examination, Dr. Miller conceded that he could not state with reasonable medical certainty that a boot stomp killed the decedent or materially contributed to his death. He also admitted that he probably would have expected to find fractured bones or damage to underlying chest tissue had an adult male with a rigid chest such as Kachanovich's been stomped with sufficient force to inflict the deep tissue injuries sustained by the decedent. He found neither symptom in Kachanovich. Finally, Dr. Miller testified that the blunt trauma injury observed in the decedent would be consistent with the sensation of a sudden and immediate need to evacuate the bowels.
On redirect examination, Dr. Miller reiterated his testimony that the decedent's injury was consistent with a boot stomp, confirming that he had reached his conclusion within the bounds of reasonable medical certainty.
Thus, the doctor consistently testified that the fatal injury was consistent with a boot stomp. While he also believed that a boot stomp probably would have materially contributed to the death of an individual who had sustained an abdominal injury in an earlier collision, he was unwilling to testify within the bounds of reasonable certainty that such a stomp actually caused or materially contributed to the decedent's death. Appellant perceives the doctor's caution in this regard to be fatal to the state's ability to establish, beyond a reasonable doubt, that his criminal agency caused or materially contributed to Kachanovich's death.[2] We believe this contention results from appellant's misconception concerning the nature and significance of expert medical testimony.
Like all expert testimony, expert medical testimony addressing the cause of death in a homicide prosecution generally is deemed advisory in nature and ordinarily not conclusive on the judgment of the jury. Annot. 65 ALR.3d 283, 288-89 (1975). See also Portis v. State, 418 So.2d 924, 927 (Ala.Ct.Crim.App.), cert. denied, 418 So.2d 927 (Ala. 1982); Hardison v. State, 30 Ala. App. 40, 42, 200 So. 635, 636 (Ct.App. 1940); Armstrong v. State, 502 P.2d 440, 446 (Alaska 1972); Commonwealth v. Hicks, 466 Pa. 499, 504, 353 A.2d 803, 805 (1975); State v. Velsir, 61 Wyo. 476, 493, 159 P.2d 371, 377. Thus, the jury may accord such testimony the weight it deems appropriate after evaluating the witness' skill and character, his demeanor on the witness stand, his possible bias, the reasoning supporting his opinion, the totality of the evidence presented in the case, and any other factors which it finds illuminating. Id.
The reported cases suggest that courts have evaluated the sufficiency of expert medical testimony concerning cause of death in light of such factors as the degree of equivocation reflected in the expert's testimony and the total evidence presented in the case. See Annot. 65 ALR.2d at 312-50; Annot. 135 ALR 516 (1941). While expert testimony as to the mere possibility of a causal relation between the act and the victim's subsequent death generally has been found insufficient to establish such a relation when standing alone, it frequently has been found sufficient when viewed in conjunction with other evidence supporting such a relation. Annot. 135 at 532.
*794 Medical testimony as to the likelihood or probability of a causal relation between the defendant's act and the victim's death has prompted a divergence of judicial opinion, with some courts finding such testimony sufficient when standing alone and others finding it insufficient. Id. It generally has been found sufficient, however, when coupled with other evidence supporting the causal relation at issue.
The Florida supreme court's decision in Baker v. State, 30 Fla. 41, 11 So. 492 (1892), overruled on other grounds sub nom, Tipton v. State, 97 So.2d 277 (Fla. 1957), suggests that Florida joins those states which uphold convictions obtained on the basis of medical testimony advancing reasonable theories of causation, when such testimony has been supplemented by other evidence supporting the causal relation at issue.
In Baker, the defendant struck the fiftyto-sixty-year-old victim twice in the face with his fist as the victim lay in a reclining position or attempted to get up from his bed. The defendant prefaced his attack with vile epithets which roused the victim from an after-dinner nap. According to an eyewitness, the victim died almost immediately after sustaining the blows, even though he had appeared perfectly fine before the attack and had not displayed any unusual physical behavior that evening. Earlier in the day, however, the victim had complained of an excruciating headache and a heaviness in his head, which he attributed to having been out "on a drunk" the previous night. Because of this complaint, he had enlisted a bartender to pour ice water over the lower back part of his head, and he had drunk five or six glasses of beer to "straighten him[self] up."
Two medical experts testified that the victim died from a hemorrhage at the base of the brain caused by ruptured blood vessels. One expert testified that blood vessels rupture from disease, accelerated heart action, or the force of a blow; consequently, the decedent's hemorrhage "might [have been] caused by a severe blow, or some excitement causing accelerated action of the heart." On cross-examination, the witness revealed that he had found chalky deposits evidencing heart disease but he had been unable to discern whether the ruptured veins or arteries had been diseased. Although the witness believed that "it would be very improbable that two blows upon the face ... should produce death," he testified that sudden excitement of the heart or some blow had been the two most probable causes of the ruptured blood vessels and that he could not tell what the real cause had been.
The second medical expert testified as a witness for the defendant, agreeing as to the actual cause of death. From his observation of the decedent, he had inferred that the decedent's heart disease extended into the arteries of his skull, particularly those about the base of the brain. The pain which the victim had described to witnesses at the bar would have been symptomatic of congestion associated with those diseased arteries, and ingestion of alcohol would have increased the amount of such congestion. In the witness' medical opinion, the ordinary blows inflicted by the defendant would not have caused the decedent's death. He conceded, however, that the excitement caused by the fight and being struck might have increased the pre-existing congestion and that striking a hard object as a result of the blow or receiving the blow while resting on a hard surface might have caused the hemorrhaging. Thus, the witness was unwilling to say positively that the blow had nothing to do with the rupture, although he thought it very improbable.
The supreme court affirmed the fourth degree manslaughter conviction rendered against the defendant, finding nothing in the medical testimony which militated against the theory that excitement producing accelerated heart action had increased the congestion or started the hemorrhage. Baker, 30 Fla. at 66, 11 So. at 499. The court noted specifically that no testimony proved or justified the inference that the victim would have died that evening if he had not been assaulted. Conversely, the *795 only rational view of the evidence suggested that the victim "was in such a physical condition or state of health as made the assault upon him fatal in its consequences, and that the effect of that assault, acting directly or indirectly upon that condition, brought to a close a life which but for it would have lasted longer." Id. According to the court, there was nothing in the evidence "capable of raising a reasonable doubt of this conclusion: a mere speculation that [the victim] might have died is not a reasonable doubt." Id.
Finally, the court observed that
[t]he testimony of the experts furnishes a reasonable theory of the operation of the assault as the cause of death; their cautiousness as to saying what produced the congestion and hemorrhage did not relieve the jury from the duty of passing upon the question of the prisoner's guilt, nor does it raise any reasonable doubt of the correctness of their decision that the assault was the cause of the death. The testimony supports the judgment to the exclusion of any reasonable doubt; and there is in the authorities cited by counsel for the accused ... nothing that shakes this conclusion.
Id., 11 So. at 500.
We find the holding of Baker applicable to the case sub judice. Under the circumstances presented, Dr. Miller's testimony furnished a reasonable theory concerning the operation of the boot stomp as the cause of death, a theory which the jury was entitled to weigh in light of the totality of the evidence introduced at trial. We believe that the jury reasonably could conclude that a stomp inflicted in an area corresponding with the location of Kachanovich's internal injuries caused or materially contributed to the decedent's death, especially when Dr. Miller found it probable that the blow had had such a causal relation to the victim's fatality.
Although appellant speculated that Kachanovich had been fatally wounded in the automobile collision, as evidenced by his dazed demeanor at the embankment and the possibility that witnesses observed him defecating after the accident, the jury well could have found that the victim's disorientation stemmed from his intoxication and that he was simply replacing clothing which he had removed to exit Benson's water-stranded vehicle, as witness Joseph McLendon surmised. Furthermore, no positive evidence established that Kachanovich's abdomen impacted with the dashboard during the collision; yet, the direct testimony of numerous eyewitnesses graphically described the boot stomp administered by appellant, a blow which prompted bystanders to intervene on Kachanovich's behalf out of fear that appellant "might beat [the victim] to death or something." The jury obviously has considered the evidence and resolved any factual questions adversely to appellant. It is not the province of this court to reweigh conflicting inferences or disturb a verdict supported by sufficient evidence. Tibbs v. State, 397 So.2d 1120 (Fla. 1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).
Because we deem the evidence sufficient to support the jury's verdict and find no merit in the second point on appeal, we affirm appellant's judgment and sentence.
Affirmed.
SCHEB, A.C.J., and OTT, J., concur.
NOTES
[1] Needless to say, neither passenger was wearing his seatbelt at the time of the collision.
[2] As appellant concedes, it is well settled in Florida that a criminal takes his victim as he finds him and "can not be excused from guilt and punishment because his victim was weak and could not survive the torture he administered." Swan v. State, 322 So.2d 485, 487 (Fla. 1975). Accord Baker v. State, 30 Fla. 41, 11 So. 492 (1892), overruled on other grounds sub nom, Tipton v. State, 97 So.2d 277 (Fla. 1957). Consequently, an accused lawfully can be convicted of a charged homicide if the jury reasonably could have concluded that his actions caused or materially contributed to the victim's death. Swan, 322 So.2d at 487; Brinson v. State, 114 Fla. 228, 198 So. 15 (1940).