97 So.2d 277 (1957)
John H. TIPTON and Alto Lee Tipton, Jr., Appellants,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
October 2, 1957.
*278 Marion B. Knight, Blountstown, for appellants.
Richard W. Ervin, Atty. Gen., and B. Jay Owen, Asst. Atty. Gen., for appellee.
DREW, Justice.
The defendants were convicted of manslaughter under Section 782.07, Florida Statutes 1955, F.S.A.:
"The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this chapter, shall be deemed manslaughter, and shall be punished by imprisonment in the state prison not exceeding twenty years, or imprisonment in the county jail not exceeding one year, or by fine not exceeding five thousand dollars."
The information charged that the defendants "did unlawfully and feloniously, by their act, procurement and culpable negligence and with utter disregard for the life and safety of H.D. Stevenson, did kill the said H.D. Stevenson by pushing, shoving and ill treating the said H.D. Stevenson".
Chronologically, but not causally stated, the following rapid concatenation of events took place: the defendants stopped at deceased's filling station to purchase gasoline; in the course of the transaction there was a certain amount of arguing between defendants and deceased over deceased's refusal to cash a check for one of the defendants; the defendants allegedly pushed deceased, but did not hit him; deceased fell to the floor and ostensibly died of a heart attack.
Our search is directed to the proposition of determining whether the evidence supports the jury verdict and whether the trial judge correctly instructed the jury as to the conduct which is proscribed by the manslaughter act. The only testimony which connects these defendants in any way with the death of deceased is that of deceased's wife, Mrs. Stevenson, and for this reason we include an extensive portion of her testimony [Mrs. Stevenson]:
"A. Well, we had just finished hanging a door, Mr. Stevenson had just finished it, and we had opened some drinks and eat some crackers, and these boys drove right up in the house you might say, they drove up between the pumps and the door, which nobody hardly ever does, Mr. Stevenson went *279 and asked them what he could do for them and they said they wanted some gasoline and he asked them how much and they said fill it up, Mr. Stevenson filled the car with gas and he came back in, and he, (pointing toward one of the Defendants), asked him if he would cash a check and Mr. Stevenson told him no, he told him, he says, `I don't know you and I can't cash the check', * * *.
* * * * * *
"A. Well, Mr. Stevenson says `boys, I can't take your check' and one of them says `how are you going to get paid for your gas if you don't cash the check, he says I've got money in the bank at Blountstown, if you don't believe it just pick up the 'phone and call the bank and they'll tell you I've got money there in the bank', and of course it was too late to call the bank there was nobody there at that time of day, Mr. Stevenson says I don't think I'll have too much trouble getting my money for the gas, and they started using bad language again, they had already been using it, and Mr. Stevenson turned around and said `look here, boys, that's my wife over there and I wish you wouldn't use that kind of language, and they got worse, and worse, and the more Mr. Stevenson tried to get them to hush the more they said and it just went from bad to worse and he asked them to leave. * *
* * * * * *
"* * * and I went around the Counter to go out and they were in a huddle, and my husband was between them, I got to the end of the store and I heard him when he fell and I turned back, I knew he had some tablets in his pocket and I reached in his pocket and got them out and then I ran to the 'phone and (pointing toward one of the Defendants) he jerked the 'phone, and I said `I'm not going to call the law' and he says `you're not going to call anybody', and I says `please let me call my son' and he wouldn't do it, I had to go across the road to Mr. Davis' to call him. * * *
"Q. Let's go back to where they were there near the Ice Box, Mrs. Stevenson. A. They was pushing him there, they just pushed him toward the Ice Box as I started out of the store, I wouldn't say that either of them laid their hands on him to hit him, but they did push him, they was still trying to get him to cash the check then.
"Q. Had they paid for the gas? A. Yes, he had paid for the gas but they was still arguing about the check after they had paid for the gas. * * *
* * * * * *
"A. No, I don't think either one of them hit him at all, but they pushed him around a little bit, they were all in a huddle over there and they were talking so ugly until my husband asked me to get out of the store.
"Q. Would you say they pushed him or he kept getting closer to them? A. They got closer to them, and they put their hands on him.
"Q. Which one of them? A. I don't know.
"Q. Allright, then, you don't know that either of them put their hands on him, do you? A. Yes, I do, they had their hands on him.
"Q. Well, which one was it had his hands on him? A. I don't know which one it was.
"Q. Actually, Mrs. Stevenson, neither of them put their hands on your husband did they? A. Yes, they did, they put their hands on him."
The trial judge charged the jury in the following manner:
"I charge you, Gentlemen of the Jury, that the laying on of your hands *280 in a rude and angry manner would constitute an assault; but before you can find these Defendants guilty of anything you must find that they made an unlawful assault on H.D. Stevenson.
"The defense relies on the fact that the deceased had a heart disease; but if you should find beyond a reasonable doubt, from the evidence in this case, that they made an assault on him, in the manner and by the means as charged in the Information, and that at the time the deceased was suffering from some disease of malady, and an attack of such malady or disease was brought on by such injuries so unlawfully inflicted upon the deceased by the Defendants, if you find that the Defendants did unlawfully inflict injuries upon the deceased, and that the deceased died from such attack brought on by such injuries inflicted, then the Defendants would be guilty of the death of the deceased, even though the injuries may not have caused death if he had not been suffering from such disease or malady.
* * * * * *
"If you should find from the evidence beyond a reasonable doubt that the Defendants, in Jackson County, Florida, at any time within two years prior to the filing of this Information, which was filed on November 8, 1955, made an unlawful assault upon H.D. Stevenson, and either the injuries from the assault or the assault itself brought on a heart attack, from which the deceased died, if you find that state of facts, beyond a reasonable doubt, then, it would be your duty to find the Defendants guilty as charged."
From the evidence and the charge we conclude that the jury could have found that the defendants placed their hands on deceased and that both defendants were drunk, disorderly and cursed deceased in the presence of his wife. The actual medical cause of death is unknown.
Deceased was 63 years of age and had been consulting a doctor for the last four months prior to his death because of an advanced stage of Angina Pectoris which was due to a coronary artery disease. The record contains expert testimony that "when a person suffering with Angina becomes excited, gets mad, over-works or over-eats this Artery has a way of closing up." Such a reaction can cause death. However, there was no testimony in this record (which according to the instructions to the clerk contains all the testimony at the trial) to show any cause of deceased's death from a medical viewpoint. More specifically, there is no testimony to show a causal connection between the alleged "pushing, shoving and ill treating" and the death of deceased. The expert witness who testified had not examined the body and did not testify that a heart attack caused deceased to die, but death by heart attack was a basic assumption of the trial. The expert witness was asked the following crucial question:
"Q. Dr. Latiolais, if Mr. Stevenson had exerted himself in doing the work I have outlined in re-building and rehanging a screen door without resting, and immediately following that have become angry, and then, following that, he had a heart attack that proved fatal, would it be possible to determine which of the three things mentioned, the work, the excitement or anger, or the heart attack determined his death? A. I don't think so. I don't think you could say which one precipitated the final attack."
Furthermore, the expert witness stated that before deceased's death there was no way to predict his life span: "We know a man having Angina Pectoris, at his age, was subject to have an attack at any time, we didn't know whether he would live a week, a month or how long he would live."
*281 The information charged manslaughter in the language of the statute, but instead of using the disjunctive "or" between "procurement" and "culpable negligence" it used the coordinate "and". Therefore a charge was given relating to culpable negligence. Naturally, the parties on appeal have discussed culpable negligence; but this case does not involve that doctrine. The crucial acts involved in the case at bar were the non-forceful, but rude pushes of defendants' hands against deceased. Human experience does not warn against such acts as being physically harmful when perpetrated upon people generally, and defendants were not put on notice of unusual conditions in deceased which would change the objective view of the risk. Their acts in relation to the circumstances were reprehensible, but did not amount to reckless disregard of human life or of deceased's safety. Futhermore, for purposes of analysis the act was an intentional, as opposed to a negligent, touching of deceased. Since neither procurement nor murder is involved, the active ingredients of Section 782.07 in the case at bar are the killing of a human being by the act of another, provided that such killing is not "justifiable or excusable homicide." The charge on culpable negligence might well have confused, but should not have affected, the jury in rendering its verdict; since in effect the trial judge charged that if the defendants made the alleged "assault" on deceased and if such "assault" caused deceased's heart attack, the jury must find defendants guilty of manslaughter.
By taking a broad definition of criminal battery: "It seems that any injury whatsoever, be it ever so small, being actually done to the person or a man in an angry, revengeful, rude, or insolent manner, as by spitting in his face, or any way touching him in anger, or violently jostling him out of the way, are batteries in the eye of the law;[1]" receiving uncritically a treatise writer's statement of "the law": "If one assaults another, but not in a way to naturally cause death or great bodily harm, he is guilty of a criminal act, and if death ensues, though contrary to his intention and wish, the homicide is manslaughter;[2]" and accepting the causal connection between the "pushing" and a fatal heart attack, there was in this case an unlawful act which caused the death of a human being  ergo: the act was manslaughter. That is the situation if logic rather than the broad implications of the statute rule decision.
Logic, however, is not the sole tool of adjudication. While it might satisfy a possible desire for revenge, entertained by deceased's relatives or friends, the punishment of the defendants for manslaughter can satisfy no public aim. Even legal philosophies which posit vengeance as a basis for criminal punishment require punishment to be proportionate to the act punished.
Consideration of the act in its surroundings at the time of its commission, not of the results alone, should determine criminal responsibility for manslaughter under the Florida homicide statute. It is necessary for the act to result in the death of a human being under the definition of homicide; but this does not relieve the courts of a duty to study the act itself to determine whether the punishment for manslaughter should be applied. This conclusion does not require the use of the shibboleths, malum prohibition and malum per se. The statute itself provides far surer guideposts.
It is clear from reading the provisions of Section 782.02, justifiable homicide, and Section 782.03, excusable homicide, *282 to which one is lead by the definition of manslaughter in Section 782.07 that every act causally connected with the killing of a human being is not punished by the homicide chapter, and more specifically, not by the general manslaughter statute. There is no need to record here any of the exemptions other than the one which is broad enough to cover the situation at hand: "Homicide is excusable when committed * * * by accident and misfortune in the heat of passion, * * * upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner." The noun "combat" has many meanings attributed to it in dictionaries  running from, "an encounter or fight between two armed persons," to a figurative use, "a conflict; struggle; strife; controversy." Oxford English Dictionary (Oxford 1933). To most of us who translate literary terms for our own times it means, either literally or figuratively, a fight. Defendants' conduct  a battle of vituperation, climaxed by rude pushes  falls within the connotation of a figuraive combat. The circumstances of the case required the trial judge at least to charge the jury upon the principle expressed in the homicide statute previously considered, that "Homicide is excusable when committed * * * by accident and misfortune in the heat of passion * * * upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner." This point was not covered in the charge.
Apparently the trial court's charge was based in part upon Williamson v. State, 1926, 92 Fla. 1094, 111 So. 245, 247. The relevant charge in the Williamson case is as follows:
"`If you should find beyond a reasonable doubt from the evidence in this case that the defendant unlawfully, and with intent to kill the deceased, T.R. McCormic, inflicted injuries upon the deceased in the manner and by the means, as charged in either count of the indictment, and that at the time the deceased was suffering from some disease or malady, and an attack of such malady or disease was brought on by such injuries so unlawfully inflicted upon deceased by the defendant, if you find that the defendant did unlawfully, and with intent to kill, inflict injuries upon the deceased, and that the deceased died from such attack brought on by such injuries so inflicted, then the defendant would be guilty of the death of the deceased, even though the injuries may not have caused death if he had not been suffering from such disease or malady.'"
The court in the Williamson case did not approve the charge in a positive way, but held:
"We find nothing in that portion of the charge complained of which, when taken with the entire charg given by the court, should either confuse or mislead the jury. Perhaps other language might have been chosen to express the same principles of law, but the language which was used was such as could be clearly understood and was not such as to be prejudicial to the defendant, and no reversible error appears to have occurred in the giving of the part of the charge complained of."
Even if the court had approved the charge in a positive manner under the circumstances of the particular case, such approval must be restricted to the particular facts of the case. The Williamson case was a prosecution for murder in the first degree wherein the defendant was convicted of murder in the second degree, defined as an unlawful killing of a human being "when perpetrated by an act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." The court's words illustrate the type of act which was involved in the Williamson case:

*283 "* * * in further finding that it was perpetrated by an act imminently dangerous to the person assaulted and that that act, to wit, the striking of an old man over the head with a walking stick and kicking him in the stomach, when perpetrated by a man in the bloom of youth and strength, evinced a depraved mind regardless of human life and even if there was not a premeditated design to effect the death of any particular individual."
The act involved was required to be "imminently dangerous to the person assaulted", therefore the physical condition of the victim was only relevant as a part of the link connecting the act with the death  another element of the crime.
There are two cases which appear to give some support to the charge of the trial judge in the case at bar  Baker v. State, 1892, 30 Fla. 41, 11 So. 492, and Gainer v. State, 1930, 100 Fla. 164, 129 So. 576. [For a collection of cases, see 47 A.L.R.2d 1072.] The Baker case affirmed conviction of defendant for fourth degree manslaughter. The defendant, provoked by a letter written by the victim, went to victim's house where he was reclining on a couch. After a brief altercation defendant struck the victim twice in the face without excessive force. The victim died of a ruptured blood vessel in the brain. The following quotations from the opinion in the case are relevant to our discussion [30 Fla. 41, 11 So. 498]:
"Manslaughter in the fourth degree, of which the defendant was convicted, is thus defined by Crim.Code 1868, p. 352, McClel.Dig.:
"`Sec. 17. The involuntary killing of another by any weapon, or any means neither cruel nor unusual, in the heat of passion, in any cases other than such as are herein declared to be excusable homicide, shall be deemed manslaughter in the fourth degree.
"`Sec. 18. Every other killing of a human being, by the act, procurement, or culpable negligence of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder, or manslaughter of some other degree, shall be deemed manslaughter in the fourth degree.'
"Counsel contending, under the third ground of the stated motion, that the evidence, even if it shows some casual (sic) connection between the striking of the blows by the defendant and the death of Brown, did not warrant the verdict, argues that, in order to sustain a verdict of manslaughter, the death of the person must have been not only directly or indirectly caused by the acts of the defendant, but must have been such as to be one of the reasonable or probable results of such acts, and if it be such as could not have occurred to the defendant as a probable result, then he should not have been held liable; that to hold otherwise is subversive of the accepted doctrine of intent which is the logical foundation of the law regarding crimes which are malum in se; that, if individuals are strictly held to a responsibility for the probable and reasonable results of their acts, society will be amply protected, without the injustice and oppression likely to be caused by the more extreme view necessary to sustain this verdict, if it can be sustained by any possible view of the evidence in this case.
"Of course, it is not necessary to the support of a verdict of manslaughter in the fourth degree that the death of the person killed should have been a reasonable or probable result of the defendant's act, in the sense in which this expression is used by the counsel, or, in other words, the fact that it could not reasonably have occurred to the defendant, or did not occur to him, that death was a probable result of the act, does not prevent a conviction of manslaughter in this degree. This being so, it is only necessary to say to the remainder of counsel's contention that *284 its discussion is beyond our functions, and that it can find practical consideration in the legislative department only."
The court concerned itself with finding a causal connection between the assault and the death, and in a passing way disposed of an argument of defendant which the court interpreted as a contention that defendant must subjectively have foreseen the fatal results of his act in order for the manslaughter statute to apply. The court said "in other words, the fact that it could not reasonably have occurred to the defendant, or did not occur to him, that death was a probable result of the act, does not prevent a conviction of manslaughter in this degree." Such a holding can be granted as valid without affecting the decision in the case at bar, therefore we will not discuss Gainer v. State, supra, which involved the same point.
The court in the Baker case continued as follows:
"Of course, no one believes that this assault would have killed a healthy man, but that it was calculated to excite in the highest degree any ordinary man, considering the unfair advantage at which the deceased was taken, the character of the blows, and the language and action of the accused, is indisputable. That the attack was hostile, excited, and angry is evident both from Bowen's account and that of the accused, and the statement of McDonald also supports this view. The blows were, at least, severe; the language of the accused exhibited very positive hostility; and the degree of his excitement is well indicated by not only his acts and language, but by his own statement, that Bowen's `voice brought me to myself.' The testimony of the experts furnishes a reasonable theory of the operation of the assault as the cause of death; their cautiousness as to saying what produced the congestion and hemorrhage did not relieve the jury from the duty of passing upon the question of the prisoner's guilt, nor does it raise any reasonable doubt of the correctness of their decision that the assault was the cause of the death. * *
"In his charge the judge said, inter alia: `The state must prove that the defendant assaulted Brown within Hillsborough county, State of Florida; that he assaulted him, and that Brown's death was caused or hastened by the assault alleged to have been committed upon him by the defendant at the bar. All these material facts are incumbent upon the state to prove, not for the defendant to disprove.' It is urged that this was misunderstood by the jury, and misled them, in that the terms or idea, death hastened by the assault, might have been misunderstood to include a collateral as well as a casual (sic) relation between the two. The argument used is: If a person could be supposed to be in such a condition, through the progress of some insidious disease, as that an unexpected touch should cause abnormal heart action sufficient to produce death, and another person, ignorant of this peculiar condition, and with no intention of inflicting more than temporary discomfort upon the body, should come up behind the first and inflict a blow however slight and with however innocent intention, and the death of the diseased person should ensue, the innocent, though technically guilty movant, would be as much guilty of manslaughter as was this defendant; that in either case the death was not the result of the blow, but the result of a pre-existing condition, and the blow only a collateral circumstance, at most, assisting to aggravate the condition.
"We must give the jury the credit of understanding that the court was speaking, as it was, of `the assault' testified *285 to by the witnesses or proved by the evidence, and of so applying the remarks of the judge; and must not impute to them a disregard of the actual case before them, and action upon an extreme suppositious case, like that put by counsel. There is no ground for even supposing that the jury was misled or misunderstood the charge."
Although the court in the Baker case did not decide the "argument horrible", which was stated in terms which might apply to the case at bar, and the manslaughter statute has been relieved of degrees, the similarities in the facts and in the elements of the Criminal Code of 1868, Section 18 (copied previously in this opinion) require an overruling of such parts of the Baker case as are in conflict with the present opinion. The Criminal Code of 1868 defined "excusable homicide" just as it is defined today. See McClel. Dig. p. 354, Section 24. However the court in the Baker case did not examine the possibilities of an application of "excusable homicide" to the facts of the Baker case as we have done with the facts in the present case.
The trial judge should have granted defendants' motion for a directed verdict the denial of which has been assigned as error, since the state failed to present any evidence to prove the cause of death or, even if proper instruction had been given, to prove that these defendants were guilty of manslaughter. See Section 918.08(1), Florida Statutes 1955, F.S.A.
Reversed.
TERRELL, C.J., THORNAL, J., and STURGIS, District Judge, concur.
HOBSON and ROBERTS, JJ., dissent.
NOTES
[1] Hawkins Pleas of the Crown (Curwood Ed. 1824) p. 110, Section 2. Also cf. the adoption of similar criteria for tort liability. Restatement, Torts Section 18.
[2] Clark and Marshall, Law of Crimes (5th Ed. 1952) Section 263(b), p. 355. See also, I Hale's Pleas of the Crown (Stokes Ed. 1847) p. 474, footnote 4, or IV Blackstone's Commentaries (Lewis Ed. 1898) pp. 192-193.