318 So.2d 502 (1975)
Terry Herbert PARKER, Appellant,
v.
STATE of Florida, Appellee.
No. X-320.
District Court of Appeal of Florida, First District.
September 9, 1975.
*503 Richard W. Ervin, III, Public Defender, and David J. Busch, Asst. Public Defender, for appellant.
Robert L. Shevin, Atty. Gen., and Andrew W. Lindsey, Asst. Atty. Gen., for appellee.
RAWLS, Acting Chief Judge.
The sufficiency of the evidence adduced by the State to withstand a motion for judgment of acquittal at the close of the State's case is the primary point on appeal posed by appellant Parker from a judgment of guilty of manslaughter.
The 14th day of June, 1974, was payday at Pope's Scrapyard located in Suwannee County, Florida. In the late afternoon, Mr. D.W. Pope permitted decedent, Cecil Carter, to use a pickup truck for the purpose of moving his father's household goods. Seated by Cecil in the cab of the truck was appellant-defendant Parker, who was Cecil's cousin and friend. In the rear of the pickup, with their backs to the cab, were two of Pope's employees who were "catching a ride to town". Approximately one minute after the vehicle departed the scrapyard, decedent was shot.
The State introduced into evidence Parker's statement as to what occurred, viz:
"Cecil [decedent] and I left Mr. Pope's place. There was two colored men in the back of the truck. Cecil and I was kidding around with one another. Cecil was driving and I was sitting on the right hand side. The pistol was laying on the dash of the truck. I picked the pistol up and pulled the hammer back and heard it click one time, but it is not supposed to fire then. I waved it by Cecil's head and it went off. I put my foot on the brake and stopped the truck and jumped out with the gun still in my hand and told the men on the back of the truck to go get Mr. Pope, that I had shot Cecil."
The first witness for the State, Stephens, one of the passengers in the rear of the pickup, testified:
"... [M]e and J.W. got on the back of the pick-up and we went on up the road a little piece and we heard something fire ... then all at once the truck stopped... . He [appellant Parker] jumped out crying, hollering about he didn't mean to do it.... He [appellant Parker] said call Mr. Pope, and I run back to the house and called Mr. Pope and he come down there and he still was saying he didn't mean to do it."
This witness further testified that he had known the decedent and Parker for eight to ten months, and in answer to the question, "They were friends?" he answered, "They acted mightly lovely together."
The State next called Mr. Pope, who testified that approximately one minute after the pickup had "pulled out" that he heard:
"... the brakes squall and the truck stop, ... Then I went on down there ... Mr. Parker was getting out of the pick-up ... with the pistol in his hand... . He got out and said, I have hurt Cecil... . I said no, you son-of-a-bitch, you killed him."
On cross-examination, Mr. Pope testified that appellant was crying when he got out of the truck and saying that he didn't mean to hurt Cecil.
Billy Pope, another witness for the State, testified that immediately after the incident appellant "was hollering that he shot Cecil. Something about there was something wrong with the gun or something... . I'm not sure what he said. I didn't understand it... . Because he was crying and taking on."
*504 The sheriff of Suwannee County and a deputy sheriff confirmed the fact that appellant was extremely upset and crying.
An expert firearms examiner employed by the Florida Department of Criminal Law Enforcement was called by the State, and this witness, after describing the type of pistol involved, testified as follows:
"There was a story given to me at the time I received this weapon and in examining the weapon I attempted to either go along with the story or show that the story was something else, so I therefore tried to fire this weapon under a variety of circumstances. One of these sets of circumstances was to load the weapon, pull the hammer back one notch to the safety notch and then pull the trigger. This allowed the hammer to drop and the hammer hit the firing pin and the firing pin protrudes just a very small distance. This very small distance is enough that the firing pin does come to rest on the primer of a loaded cartridge case. I did this repeatedly in an attempt to make this weapon fire every time I did this. It would not. I [it] would only do it every once in a while."
In answer to the assistant state attorney's questions, "How would it be accidentally discharged if the hammer was all the way down? Would it take some external force?", this witness answered, "Almost any small amount of force... . A jar. I have known of this type of weapon going off when someone was trying to pull it from a holster and they caught the spur of the hammer on their belt." He further testified that the weapon would fire randomly if the trigger were pulled while it was in the safety notch. Sometimes it would and sometimes it would not. Finally, on cross-examination, the witness answered "Yes sir" to the question, "And on the basis of your examination of the physical and tangible evidence is that consistent [sic] with the story that was given?"
Mr. Justice Drew's opinion in Carraway v. Revell[1] is a landmark case. There, the Court reviewed an opinion in this Court[2] which held that gross negligence in a civil action is the same in legal contemplation as culpable negligence in a manslaughter case. In quashing this Court's opinion, the Supreme Court cast three molds of negligence: 1) simple negligence; 2) gross negligence; and 3) culpable negligence.
In Miller v. State,[3] the Supreme Court reviewed a manslaughter conviction arising out of an automobile accident.[4] After reviewing the factual circumstances leading up to the traffic death of an innocent victim, the State argued:
"... the defendant `blindly' drove his automobile into the path of an oncoming vehicle and that the defendant `became upset that he was being slowed down [by the car ahead of him] and slammed into the other lane of traffic and right into the path of deceased's automobile,' and therefore the defendant is just as guilty `as if he had fire [sic] a gun indiscriminately and killed him in that manner.'"
The Court commented upon this argument by noting that: "The inferences which the State attempts to draw from the admitted or proven facts in this case do not attain the dignity of evidence which may lawfully be the basis of a conviction." The opinion then reviews the fact that defendant's wife and baby were sitting in the front seat with him, and that the correct inference to be drawn from the proven facts was that defendant's act was the result of momentary lapse of memory, inattention or mistake. The Court concludes:
"This is not the kind of a situation where the alleged gross and flagrant act *505 endangers only the life or safety of another and where the actor and his loved ones would remain unscathed, such as would be the case of firing a gun indiscriminately down a busy street as suggested in the State's argument [emphasis supplied]."
Here, the decedent and the actor (appellant), according to the State's witnesses, were cousins and "they acted mightly lovely together". According to the State's firearms expert, this particular weapon might well have fired at any time, and a logical inference from this testimony is that appellant unknowingly was subjecting himself to personal injury in handling the weapon; he did not "indiscriminately" fire the gun.
Sharp v. State[5] is in point. There, the appellant "indiscriminately" fired a shotgun into a crowd engaging in a fracas gathered outside his "Hog Pen Bar". The appellant testified that he stumbled and the shotgun fired accidentally. The appellate court, in finding that the State had failed to prove to the exclusion of every reasonable doubt that appellant was culpably negligent, observed that there was no indication that appellant Sharp had any reason or cause to shoot the victim. In Sharp, the appellant intentionally pointed a loaded shotgun in the direction of a crowd for the purpose of restoring order. Here, appellant "waved" a pistol which had the hammer positioned in the "safety notch" and was of the belief that it would not fire. The facts in Sharp constitute a higher degree of negligence than those that are present in this case, and if the Sharp facts do not make out a prima facie case of culpable negligence, it is inescapable that the facts in the instant cause fall far short of such proof.
Last, we review Getsie v. State.[6] On Christmas morning, appellant Getsie, an auxiliary policeman, was enjoying the Christmas tree with his young wife of nine months who had given him a new gun, gun belt, and handcuffs among her presents to him. Getsie, who was experienced in handling firearms and who knew the gun was loaded, pulled the hammer back and forth and released it slowly, seeing how it worked. His wife cautioned him not to be "goofing around with the gun in the house". While walking toward his wife and as he started to sit in his wife's lap, the gun discharged killing his wife. In reversing the manslaughter conviction, the Fourth District Court of Appeal held that the evidence failed to measure up to the standard of negligence such as would sustain a conviction of manslaughter. The facts are analogous in Getsie and the instant case: no friction or ill will, handling a loaded weapon; and immediate remorse after the tragedy by the "actor".
The Supreme Court cogently observed in Tipton v. State[7] that criminal responsibility for manslaughter should be determined by consideration of the act which resulted in death in its surroundings at the time of its commission and not consideration of the result alone.
We conclude that the evidence adduced by the State, when considered in the light of every fact which was before the jury, the inferences attempted to be drawn by the State, and upon which its entire argument for affirmance rests, are unreasonable, illogical, and do not naturally flow from the evidence. The trial judge erred in denying appellant-defendant's motion for judgment of acquittal.
Reversed.
MILLS and SMITH, JJ., concur.
NOTES
[1] Carraway v. Revell, 116 So.2d 16 (Fla. 1959).
[2] Carraway v. Revell, 112 So.2d 71 (1 Fla. App. 1959).
[3] Miller v. State, 75 So.2d 312 (Fla. 1954).
[4] At an early date, Florida recognized that an automobile is a dangerous instrumentality. See Southern Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629 (1920).
[5] Sharp v. State, 120 So.2d 206 (2 Fla.App. 1960).
[6] Getsie v. State, 193 So.2d 679 (4 Fla.App. 1966).
[7] Tipton v. State, 97 So.2d 277 (Fla. 1957).