425 So.2d 641 (1983)
Donald AIKEN, Appellant,
v.
The STATE of Florida, Appellee.
No. 81-1967.
District Court of Appeal of Florida, Third District.
January 25, 1983.
*642 Bennett H. Brummer, Public Defender and Elliot H. Scherker, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Calianne P. Lantz, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and HUBBART and NESBITT, JJ.
SCHWARTZ, Chief Judge.
Aiken was charged with second degree murder and found guilty of manslaughter. We reverse the conviction upon the holding that the victim's death was an excusable homicide.
The record shows[1] that the eventually fatal incident began when, as he had often in the past, the defendant was searching for food in the garbage containers at the rear of a Miami supermarket. He was holding a plastic milk crate which he intended to use to gain access to a garbage dumpster, when he was approached by Robert Dawson. Mr. Dawson lived nearby and was apparently incensed by the adverse effect the activities of Aiken and his compatriots were supposedly having on the neighborhood. A confrontation ensued in which both men "called each other some nasty words," and, which, after some mutual pushing and hauling,[2] culminated in Aiken's using the milk crate to shove Dawson backwards away from him and onto the ground.[3] Unfortunately for both of them, the back of Dawson's head struck the ground and he died from the fractured skull which resulted from the impact.
*643 Under Sec. 782.07, Fla. Stat. (1981),[4] a killing is not manslaughter if it involves an "excusable homicide." That is the case here. Dawson's unfortunate death was clearly one which occurred, as defined in Sec. 782.03, Fla. Stat. (1981),[5] "upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner." This conclusion is supported, in fact required, by the virtually identical case of Tipton v. State, 97 So.2d 277 (Fla. 1957). There, the victim died of a heart attack after being pushed to the floor at the end of an abusive argument with the defendants. The supreme court held that the death was an excusable homicide and did not therefore constitute manslaughter.[6] It stated
From the evidence and the charge we conclude that the jury could have found that the defendants placed their hands on deceased and that both defendants were drunk, disorderly and cursed deceased in the presence of his wife.
* * * * * *
It is clear from reading the provisions of Section 782.02, justifiable homicide, and Section 782.03, excusable homicide, to which one is lead by the definition of manslaughter in Section 782.07 that every act causally connected with the killing of a human being is not punished by the homicide chapter, and more specifically, not by the general manslaughter statute. There is no need to record here any of the exemptions other than the one which is broad enough to cover the situation at hand: `Homicide is excusable when committed * * * by accident and misfortune in the heat of passion, * * * upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner.' The noun `combat' has many meanings attributed to it in dictionaries  running from, `an encounter or fight between two armed persons,' to a figurative use, `a conflict; struggle; strife; controversy.' Oxford English Dictionary (Oxford 1933). To most of us who translate literary terms for our own times it means, either literally or figuratively, a fight. Defendants' conduct  a battle of vituperation, climaxed by rude pushes  falls within the connotation of a figurative combat.

* * * * * *
The trial judge should have granted defendants' motion for a directed verdict the denial of which has been assigned as error, since the state failed to present any evidence to prove the cause of death or, even if proper instruction had been given, to prove that these defendants were guilty of manslaughter. [e.s.]
97 So.2d at 280, 281-82, 285.
Since, like the defendants in Tipton, Aiken administered nothing more than a "rude push" following a "battle of vituperation" and therefore engaged only in a "figurative combat," we must also find that Dawson's death was excusable and not the result of manslaughter. Accord, People v. Vollmer, 299 N.Y. 347, 87 N.E.2d 291, 292-93 (1949) (no manslaughter committed when "flurry of blows from defendant's fist sent the other man to the floor and to *644 death"); Mead v. State, 65 Okla. Cr. 86, 83 P.2d 404, 410 (1938) (same when homicide was the result of a single blow, culminating an altercation between accused and deceased); State v. Lange, 82 S.D. 666, 152 N.W.2d 635, 638-39 (1967) (same when deceased died from "injuries sustained in an ordinary drunken street brawl in which the defendant only used his bare hands in throwing the victim once to the pavement; ... single momentary blow, or thrust to the pavement ... even when applied with considerable force" which results in death is not manslaughter). The state attempts to distinguish Tipton on the ground that Aiken used the milk crate, which it says was a "dangerous weapon," against the victim. Since, however, the crate was used only to push Dawson backward, and his death was caused by the push and fall, and not by the crate,[7] this position is entirely groundless. See M.M. v. State, 391 So.2d 366 (Fla. 1st DCA 1980); Smith v. Nussman, 156 So.2d 680 (Fla. 3d DCA 1963). Under the circumstances, the crate was simply an extension of Aiken's hands and the functional equivalent of Tipton's.
For these reasons, the judgment is reversed and the cause remanded with directions that the appellant be discharged.
Reversed and remanded.
NOTES
[1] The only independent witness was a neighbor of the decedent who viewed the incident from some distance away. His testimony was not at all inconsistent with the defendant's, which must therefore be regarded as controlling the question of the sufficiency of the evidence. McArthur v. State, 351 So.2d 972, 976-78 (Fla. 1977), and cases cited.
[2] The defendant claims that this evidence, see n. 3, infra, establishes that he acted in self-defense and that the death was therefore justifiable homicide under Sec. 776.012, Fla. Stat. (1981). It is unnecessary to pass upon this contention.
[3] Aiken described, see n. 1, supra, the ultimate events as follows:

A. So he had taken his hand and placed it on the plastic container which I had in my right hand, and I had taken my right hand and thought in my own mind that he was going to do some harm to me so I had taken my right hand with the plastic container and had twisted myself towards him with the plastic container, shoving it into the man's chest and knocking the man to the ground, and he never got back up, so naturally I got scared and walked away from him.
* * * * * *
Q. Okay, Were you scared of him?
A. In a sense yes, and in a sense no, because neither one of us backed up from each other.
Q. Okay. In what sense were you not afraid of him?
A. Because I felt he was going to do some harm to me.
Q. No. My question is: How were you afraid of him; what did he do to make you afraid of him?
A. Well, it was just the way he  the expression on his face, the way he conducted himself. But then again, on the same token, I was not afraid of him because I knew I could handle myself.
Q. Alright. What caused you to shove the milk crate into his chest?
A. Well, when he took his right hand and placed it over the  I should say on the side of the milk crate pushing the milk crate and telling me put the milk crate down. Well, right there I figured he was going to do some bodily harm to me.
Q. How did you figure he was going to do some harm to you?
A. I figured he was going to haul off and hit me. So naturally I took a normal response and just plowed the milk crate into his chest knocking him backwards.
* * * * * *
Q. How much force did you use?
A. I'd say I used quite a bit. I would say enough to shove him backwards and knock him on the ground, on his back.
* * * * * *
A... . My impression of the whole thing, I thought he was going to hit me or harm me in some kind of a way, and that's the reason I plowed the crate into his chest and knocked him onto the ground.
Q. Did he raise his fists like he was going to hit you or anything?
A. The only thing he did that made me respond the way I did, was he pushed the crate to the side and said, `Put it down.'
* * * * * *
A... . He did not make any threats at me. But when he pushed the crate away to the side, that's when I felt that he was going to try to harm me. So that's when I took my response.
[4]  The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, shall be deemed manslaughter and shall constitute a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
[5] The entire section provides

Excusable homicide.  Homicide is excusable when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution, and without any unlawful intent, or by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapons being used and not done in a cruel or unusual manner.
[6] The fact that the Tipton court also and alternatively held that the cause of death had not been established does not affect the binding nature of this conclusion. Clemons v. Flagler Hospital, Inc., 385 So.2d 1134, 1136, n. 3 (Fla. 5th DCA 1980).
[7] The medical examination of Dawson's body revealed only minor bruises, which did not contribute to his death, at points corresponding to where the crate had been placed.